UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -v-                                                 CASE NO.: 19-CR-088 (GTS)

MIRKO RALLI-FALCONI,

                 Defendant.

# MEMORANDUM OF LAW
# IN SUPPORT OF MIRKO RALLI-FALCONI'S
# MOTION TO SUPPRESS EVIDENCE

DATED:    April 17, 2019          Respectfully submitted,
             Syracuse, New York

                                     LISA A. PEEBLES
                                     Federal Public Defender

                           By:

                                     Gabrielle DiBella, Esq.
                                     Assistant Federal Public Defender
                                     Office of the Federal Public Defender
                                     4 Clinton Square, 3rd Floor
                                     Syracuse, New York   13202
                                     (315) 701-0080

## PRELIMINARY STATEMENT

Defendant Mirko Ralli-Falconi is charged in a one-count indictment with Illegal Re-Entry, in violation of 8 U.S.C. §1326. Mr. Ralli-Falconi now moves, pursuant to Federal Rule of Criminal Procedure 12(b) to suppress (1) any and all statements made to law enforcement on February 26, 2019 at the Syracuse Regional Transportation Center; (2) any and all statements made to law enforcement on February 26, 2019 at the Oswego Border Patrol Station; (3) the entirety of his immigration file (A-file) including a prior removal order; and (4) his fingerprints.

Mr. Ralli-Falconi moves to suppress statements made at the Regional Transportation Center because they were the product of an unlawful seizure tainted by race and ethnicity. This initial unlawful seizure tainted the entire interaction, and as such, his A-file and his fingerprints that were found as a result of the unlawful seizure must be suppressed. Mr. Ralli-Falconi also moves to suppress statements made at the Oswego Station because they were obtained in violation of his Fifth Amendment rights. Mr. Ralli-Falconi was subject to questioning after having been arrested, and wasn't read his Miranda rights until hours after the arrest and interrogation. Further, these statements were not voluntary. Mr. Ralli-Falconi moves to suppress the entirety of his A-file as well as his fingerprints, because they were only discovered as the result of his illegal seizure, as well as from statements made in violation of his Fifth Amendment rights. The defendant requests this motion be granted; or in the alternative, he requests an evidentiary hearing to aid the Court in determining the issues raised herein. Further, the defendant requests the hearing be held on a date sufficiently prior to the commencement of trial.

## STATEMENT OF FACTS

On February 26, 2019, Border Patrol Agents Jared Bell and Roger Audet were assigned to the Regional Transportation Center in Syracuse, New York, during their 6:00 a.m. to 4:00 p.m.

shift. See Department of Homeland Security Narrative, attached as Defendant's Exhibit A. At approximately 12:40 p.m., Agent Bell, "while wearing a full Border Patrol rough duty uniform" encountered two subjects, later identified as Mr. Mirko Ralli-Falconi, and his wife, Ms. Maria Julia Mesones-Zapata. Exhibit A. Mr. Ralli-Falconi and his wife were in line to board the 12:45 p.m. bus to New York City. Exhibit A. There were multiple people waiting in line with them. See attached Affidavit. There was an African-American couple in front of them who were asked questions by the agents. Defendant's Affidavit. Next, the agents approached Mr. Ralli-Falconi, who speaks Spanish, and his wife, and they were questioned about their citizenship. Exhibit A, Defendant's Affidavit. Both responded that they were not United States citizens and were from Peru. Exhibit A. Through continued questioning, the officers determined that the two were not in possession of any documents allowing them to pass through or reside in the United States. Exhibit A. Record checks revealed that Mr. Ralli-Falconi had been previously ordered removed from the United States. Exhibit A. Mr. Ralli-Falconi and his wife were placed under arrest at 1:00 p.m. and transported to the Oswego Border Patrol Station for processing. Exhibit A.

At the Oswego Station, Mr. Ralli-Falconi was questioned by Border Patrol Agents about his entry into the United States. Exhibit A. The entirety of the questioning was done in English despite the fact that Mr. Ralli-Falconi's speaks Spanish and has limited understanding of English. Defendant's Affidavit. After this questioning, Mr. Ralli-Falconi was advised of his Miranda rights in Spanish at 3:07 p.m., at which point he invoked his right to remain silent. Exhibit A. It was not until this point in time that he realized he had no obligation to speak to the agents. Defendant's Affidavit.. Mr. Ralli-Falconi was fingerprinted and his fingerprints were run through the Integrated Automated Fingerprint Identification System (IAFIS) and they were used to identify him. Exhibit A. The National Records Center was contacted to obtain copies of removal documents and his A-

file. Exhibit A.  All of the above evidence was used to bring the instant charge against Mr. Ralli-Falconi.

## ARGUMENT

### I. THIS COURT SHOULD SUPPRESS ANY AND ALL EVIDENCE OBTAINED AND DERIVED FROM THE UNCONSTITUTIONAL STOP AND SUBSEQUENT ARREST OF MR. RALLI-FALCONI.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry v. Ohio,* 392 U.S. 1, 8-9 (1968).  "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Id.* at 9 (quoting *Union Pac.R.Co. v. Botsford,* 141 U.S. 250, 251 (1891)).

"[T]he ultimate measure of the constitutionality of a government seizure is reasonableness," which is "generally determined by balancing the particular need to search or seize against the privacy interests invaded by such action." *United States v. Compton,* 830 F.3d 55, 61 (2d Cir. 2016) (quoting *United States v. Bailey,* 743 F.3d 322, 331 (2d Cir. 2014)).

Given these considerations, *Terry* carved out a limited exception to the Fourth Amendment rule that a person cannot be seized absent probable cause to believe that person has committed, or is about to commit, a crime. *Terry,* 392 U.S. at 21.  A police officer is allowed to conduct an investigatory stop of a person based on reasonable suspicion, which requires, "some level of objective justification" and must be "supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow,* 490 U.S. 1, 7 (1989) (quoting *terry,* 392 U.S. at 30).  While the

level of suspicion giving rise to reasonable suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence," it must be based on more than a hunch. *Id.* A hunch is characterized as an "inchoate and unparticularized suspicion." *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000) (quoting *Terry,* 392 U.S. at 27). In assessing whether officers have reasonable suspicion to initiate a stop, a court must consider the totality of the circumstances. *Sokolow,* 490 U.S. at 7-8.

### A. Border Patrol's authority to conduct roving stops is statutory and does not override the Fourth Amendment.

In 2002 the Immigration and Naturalization Service (INS) was split into three components consisting of Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), and Customs and Border Protection (CBP). Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002). Border Patrol exists within CBP. Border Patrol's primary mission is to detect and prevent the illegal entry of aliens into the United States; more specifically to "protect our Nation by reducing the likelihood that dangerous people and capabilities enter the United States between the ports of entry." *Border Patrol Overview*, U.S. Customs and Border Patrol (last modified on April 26, 2018), https://www.cbp.gov/border-security/along-us-borders/overview. Their "priority mission" is "preventing terrorists and terrorists weapons, including weapons of mass destruction, from entering the United States." *Id.* CBP has grown into the federal government's largest law-enforcement agency. *CBP Enforcement Statistics FY 2019*, U.S. Customs and Border Protection (last visited 4/14/19), https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics.

Border Patrol has statutory authority to operate within a "reasonable distance" of the border. 8 U.S.C. §1357(a)(3) (2006). "Reasonable distance" has been defined as being within 100 miles of the border. 8 C.F.R. §287.1(a)(2) (2010). Section 287(a)(1) of the Immigration and Nationality

Act provides Border Patrol Agents the right to interrogate an alien, or any person believed to be an alien as to his right to be in or remain in the United States. However, this statutory authority does not supersede a person's Fourth Amendment right to be free from unreasonable searches and seizures. Thus, while Section 287 authorizes Border Patrol Agents some power to question, this authority "is not license to interrogate persons indiscriminately or on a wholesale basis." *Marquez v. Kiley*, 463 F. Supp. 100, 106 (S.D.N.Y. 1977).

Border Patrol uses three types of surveillance outside of the border: fixed checkpoints, temporary checkpoints, and roving patrols. *See Almeida-Sanchez v. United States*, 413 U.S. 266, 268 (1973). Checkpoints typically consist of routine questions regarding citizenship, legal status, and any other suspicious circumstances that may indicate that crime is afoot. These checkpoints are typically marked with cones, flashing lights, or even signs. *See, e.g., United States v. Martinez-Fuerte*, 428 U.S. 543, 545-46 (1976). Routine checkpoints are seen as administrative in nature, and give notice to motorists that such a checkpoint is occurring. Because roving patrols do not put people on notice, and because they are also looking for criminal activity, they are treated separately from checkpoints. *See, e.g., Michigan Police Department of State Police v. Sitz*, 496 U.S. 444, 453 (1990) (noting the differences between checkpoints and roving patrols); *Brignoni-Ponce*, 422 U.S. at 883-84 (distinguishing between checkpoints and roving patrols, and holding that "[f]or the same reason that the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens.").

This statutory authority does not allow Border Patrol to "dispense entirely with the requirement that officers must have a reasonable suspicion to justify roving-patrol stops." *United States v. Brignoni-Ponce,* 422 U.S. 873, 883 (1975). In the context of a roving border patrol stop,

5

the Supreme Court in *Brigoni-Ponce* denounced the stop of a person based solely on the person's race, or appearance. *Id.* at 887; *see also United States v. Ramos*, 753 F. Supp. 75, 79 (W.D.N.Y. 1990) (holding that "[l]ooking Hispanic is comparable to looking Mexican, and cannot alone justify a stop for potential immigration violation."). Even race combined with travel does not rise to the constitutional level required for a stop. *See e.g., Ramos,* 753 F.Supp. at 80 ("Defendant was stopped because she appears Hispanic and was traveling from a known source city, New York. That alone does not entitle a federal agent to stop a person for questioning…"). Reasonable suspicion is always required in order for a *Terry* stop to comply with the Fourth Amendment. *Brigoni-Ponce,* 422 U.S. at 884.

This "appearance" factor discussed in *Brigoni-Ponce* has come under scrutiny for its subjectivity in allowing roving patrols to rely on their own opinions of how an illegal alien may dress and even how an illegal alien may style their hair. *See e.g., United States v. Ortega-Serrano*, 788 F.2d 299 (5th Cir. 1986) (Hispanic appearance combined with an "uneven paint job" does not justify a stop); *Nicacio v. INS*, 768 F.2d 1133 (9th Cir. 1985) (rejecting the claim that Hispanic appearance and presence in an area frequently traveled by illegal aliens provides reasonable suspicion); *United States v. Pena-Contu*, 639 F.2d 1228 (5th Cir. 1981) (rejecting the claim that reasonable suspicion exists when a Hispanic male is sitting low in the back seat); *Ramirez v. Webb*, 599 F.Supp. 1278 (W.D. Mich. 1984) (Hispanic appearance combined with out-of-state license plates and work clothes does not create reasonable suspicion). Although *Brignoni-Ponce* dealt with automobiles, it would be "anomalous to guarantee the automobile driver greater freedom of movement than that afforded the pedestrians." *Illinois Migrant Council v. Pilliod*, 398 F.Supp. 882, 898 (N.D. Ill. 1975).

### B. Mr. Ralli-Falconi was seized at the Regional Transportation Center

Under the totality of the circumstances, Mr. Ralli-Falconi was seized in violation of the Fourth Amendment because there was no reasonable suspicion present to approach or question Mr. Ralli-Falconi as he stood in line waiting to board his bus. The agents have cited no "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that Mr. Ralli-Falconi was an alien who may have been in the United States illegally.

Here, Mr. Ralli-Falconi was in line waiting to board a bus to New York City that was set to leave for a destination within the same state in approximately 5 minutes. The armed officers were in "full Border Patrol rough duty uniform." Exhibit A. The officers stated nothing unusual about Mr. Ralli-Falconi's behavior while he stood in line. If Mr. Ralli-Falconi had walked away or otherwise left the line, he risked missing his bus. Aside from the urgency created by the timing of the approach, the behavior of the agents also indicated he was not free to leave. Although their weapons were not drawn, they were clearly visible and within reach. They spoke to Mr. Ralli-Falconi in an unfamiliar language and persisted in their questioning for several minutes. Therefore, the encounter was not consensual and was conducted in violation of the Fourth Amendment.

### C. All Verbal and Physical Evidence Obtained As a Result of the Unlawful Seizure Must Be Suppressed Pursuant to the Exclusionary Rule.

Because Mr. Ralli-Falconi's seizure was due to his appearance, this seizure was unreasonable under the Fourth Amendment. It is well established that "[a]ny evidence seized based upon an illegal stop is subject to the fruit of the poisonous tree doctrine, and may be suppressed." *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994 )(internal quotation marks removed). Therefore, any statements attributed to Mr. Ralli-Falconi during questioning at the Regional Transportation Center must be suppressed.

Verbal statements derived from an unreasonable seizure are no less the "'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." *Wong Sun v. United States*, 371 U.S. 471, 485 (1963). The policies underlying the exclusionary rule also do not support a distinction between physical or verbal evidence; and the "danger in relaxing the exclusionary rules in the case of verbal evidence would seem too great to warrant introducing such a distinction." *Id.* at 486. Thus, Mr. Ralli-Falconi's statements at the Transportation Center were the result of an unreasonable seizure and must be suppressed. The use of these statements to find his A-file and removal order are likewise the fruits of a poisonous tree and should also be suppressed.

## II. ANY STATEMENTS OBTAINED PURSUANT TO THE UNLAWFUL SEIZURE WERE ALSO OBTAINED IN VIOLATION OF THE FIFTH AMENDMENT.

So deeply rooted in the American adversarial system is the notion that no man should be forced to become a witness against himself, that the founding fathers clothed this idea with the "impregnability of a constitutional enactment." *Brown v. Walker*, 161 U.S. 591, 596-97 (1896). This privilege against self-incrimination is so fundamental to the American adversarial system because it "demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." *Chambers v. State of Florida*, 309 U.S. 227, 235-238 (1940). The privilege against self-incrimination is, and always has been, "as broad as the mischief against which it seeks to guard." *Counselman v. Hitchcock*, 142 U.S. 547, 562 (1892).

The Fifth Amendment prohibits the Government from introducing at trial involuntary statements made by a defendant which were obtained during a custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436 (1966). The government bears the burden of establishing, by a

preponderance of the evidence, that a statement was "truly the product of free choice." *United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir. 1996). A statement is not voluntary if is the product of "circumstances that overbear the defendant's will at the time it is given." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).

Prior to any custodial interrogation, a person must be warned "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). This is because custodial interrogation generates "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he does not otherwise do so freely." *Id.* at 467. In order for these safeguards to apply, a person must both be in custody and subject to interrogation. *United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017) (*citing Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)). Specifically, custodial interrogation occurs when an individual is subjected to questioning by law enforcement officers, in a setting that deprives him of his freedom or action in any significant way. *Miranda*, 384 U.S. at 444. Thus, custody and interrogation are two separate elements in the *Miranda* analysis. *See e.g., Cruz v. Miller*, 255 F.3d 77, 80-81 (2d Cir. 2001).

The Fifth Amendment serves to protect people "in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Miranda,* 384 U.S. at 467. A person is in custody if a reasonable person in the same situation would "have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane,* 516 U.S. 99, 112 (1995). This inquiry is an "objective inquiry that asks (1) 'whether a reasonable person would have thought he was free to leave the police encounter at issue' and (2) whether a 'reasonable person would have understood his freedom of action to have been curtailed

to a degree associated with formal arrest.'" *United States v. Faux*, 828 F.3d 130, 136 (2d Cir. 2016) (quoting *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004)).

Factors to be considered include the location, timing, and length of questioning, as well as the length of the suspect's detention before questioning. *Orozco v. Texas,* 394 U.S. 324, 326-27 (1969). Also relevant to the determination is the presence and placement of officers during an interrogation session. *See New York v. Quarles,* 467 U.S. 649, 655 (1984) (defendant was determined to be in custody because he was handcuffed and surrounded by four officers during his interrogation). If a suspect's only means of egress from the place of interrogation is blocked may indicate the suspect is in custody for *Miranda* purposes. *Berkemer v. McCarthy,* 486 U.S. 420, 437-38 (1984). If a suspect is questioned at a police station, the location of the interrogation will be considered more custodial in nature than a more "neutral" location for questioning. *Orozco,* 394 U.S. at 326-27.

Miranda protections apply when a person in custody is subject to express questioning or its equivalent. *Rosa v. McCray*, 396 F.3d 210, 220 (2d Cir. 2005). Interrogation need not take the form of express questioning, it can also include "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Inniss*, 446 U.S. 291, 300-301 (1980). The determination concerning what constitutes an interrogation is made "without regard to objective proof of the underlying intent of the police." *Inniss*, 446 U.S. at 301.

In determining whether a statement is voluntary, it is necessary to assess the totality of the surrounding circumstances- the characteristics of the accused and the details of the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Courts may look to the defendant's lack of education, *Payne v. Arkansas,* 356 U.S. 560 (1958); the lack of any advice about his constitutional

rights, *Davis v. North Carolina*, 384 U.S. 737 (1966); and the repeated and prolonged nature of the questioning, *Ashcraft v. Tennessee*, 322 U.S. 143 (1944). Here, Mr. Ralli-Falconi could not speak English when he was questioned, and despite his difficulty with the language, the officers continued to question him while as he was attempting to board a bus that was set to depart in five minutes.

## CONCLUSION

Based on the above analysis, any and all evidence, including physical evidence and any statements attributed to the Defendant, obtained as a result of the illegal stop and subsequent arrest of Mr. Ralli-Falconi, should be suppressed.   Alternatively, Mr. Ralli-Falconi requests an evidentiary hearing on the matter.

DATED:      April 17, 2019                        Respectfully submitted,
                                                  LISA A. PEEBLES
                                                  Federal Public Defender

                                            By:   */s/*
                                                  Gabrielle DiBella
                                                  Asst. Federal Public Defender
                                                  4 Clinton Square, 3rd Floor
                                                  Syracuse, New York 13202
                                                  (315) 701-0080

TO:   Michael D. Gadarian, AUSA
      Mirko Ralli-Falconi

11